G. C. Douglass *v.* The State.

1. Charge of the Court. — A correct exposition of the law called for by the evidence cannot be impugned upon any assumption that it misled the jury into finding as facts the hypotheses on which it was based, — as, for instance, in a trial for murder, an instruction detailing the well-established *indicia* of express malice.

2. Same — Murder in the Second Degree. — Since the earliest adjudications in Texas upon felonious homicide it has been uniformly held that from an intentional homicide, not committed with express malice nor under circumstances of justification, excuse, or mitigation, the law implies malice and the offence is murder in the second degree.

3. Practice. — Defects in the minutes of the court respecting the presentment of the indictment are not primarily available after verdict.

4. Practice in this Court. — It is not the practice of this court to disturb the finding of a jury upon conflicting evidence.

Appeal from the District Court of McLennan. Tried below before the Hon. L. C. Alexander.

This appeal is from a conviction of murder in the second degree, and an assessment of ten years in the penitentiary. In one count the indictment charged that the appellant, on March 24, 1879, murdered King Bryant by cutting him with a knife, and in a second count, that he murdered said Bryant by striking him with a rifle gun.

The deceased, it appears, was a tenant of the defendant, having rented a part of a forty-acre field, and occupied a house upon it. The field was an oblong, and the parties, it seems, lived on or near its opposite extremes, and at a

distance of some five hundred and fifty yards from each other. About the middle of the field there was a garden or onion patch, near which the encounter occurred. The difficulty between the defendant and the deceased arose from dissatisfaction of the former with the progress made by the latter in preparing to plant the land he had rented. In whatever manner the conflict between them was precipitated,— which was the most material issue in the case,— it was a mutual one, and the defendant was severely injured in it by the fracture of his left arm near the shoulder, and by two wounds on his head. A physician examined these injuries on the day they were received, and testified that the fracture of the arm was caused by a gun-shot wound, and that one of the injuries on the head was made with a knife, and the other with a blunt instrument. He stated further that the gun-shot wound in the arm may have fractured it but partially, and the fracture may have been completed by use of the arm in striking with a heavy weapon. The witness saw the body of the deceased the night of the same day, lying in the field where the conflict occurred. He examined it by the light of a lantern, and on the front of the head found a wound three or four inches long, evidently inflicted with a blunt instrument. He also found that the deceased had been cut in the face, the back, and the right side. The cut in the side reached the cavity, and was mortal; it entered in front and ranged towards the spine. Whether the injury on the head of the deceased had fractured his skull, the witness could not say, as he did not probe it. Other witnesses stated that the hands of the deceased were also cut.

Mrs. Bryant, widow of the deceased, was a witness for the State. She testified that on Wednesday prior to the Monday on which her husband was killed, she was at the garden or onion patch, when the defendant came there and asked her whether her husband was going to split rails all the year, or work the land as he had agreed to do. Deceased

had been splitting rails for several days, said the witness, because the ground was too wet to plant cotton. Defendant said he would like to know how the deceased would pay house rent; to which she replied that she did not think they owed any house rent, that they had rented the ground, and the house was not worth paying rent for. He said the house was as good as the renters, and he did not "a d—n bit" like the way the deceased was doing. Witness told defendant that he knew they were hard run, and that her husband had to do all the work he could to make a living; and he replied that he would make the deceased work the land; to which she retorted that she did not know how she could make any one work the land. Witness said that her husband had all his land bedded up, ready to plant in cotton. She told him, when he came home, what the defendant had said to her at the garden, and he replied, "Never mind Mr. Douglass; he likes to talk." He said he would rather give up all the work he had done, than have a difficulty with Douglass.

On the Sunday before the Monday on which the deceased was killed, he and witness went on a visit to Mr. Richey's, from whom he had bought a rifle two or three weeks previous, but had not got it in possession, because Mr. Richey had then loaned it to a neighbor. On the Sunday in question, Richey had got the rifle from the borrower, and told the deceased he could take it home with him, and that the sights needed regulating. That evening the deceased fired the gun a time or two to regulate the sights, and then reloaded it and laid it on the bed. That morning the witness and the deceased, while on their way to Richey's, stopped at the defendant's, but he was from home. "My husband and the defendant," said the witness, "were as friendly as brothers."

On account of intervening timber, the garden near which the conflict occurred could not be seen from the house occupied by witness and her husband. She did not hear

the report of a gun at the time it took place, but observed the wife of the defendant running from the latter's house towards the garden, and hallooing as she ran; but witness could not understand what she said, and started to see what was the matter with her. Passing the timber, she saw Mrs. Douglass having hold of the defendant; they were scuffling as though she had dragged him off of some one. Defendant pulled loose from her and started towards his house, and had gone a little distance, when the deceased got up from the ground close by Mrs. Douglass, and they appeared to exchange some talk, when Mrs. Douglass stooped down and picked up something which she handed to the deceased, and then went off after the defendant. Witness met the deceased some fifty or sixty feet from where he arose from the ground. He had in his hands the pieces of the gun, which had been broke in two near the lock. He was very bloody, and blood was running out of his nose and ears. To her inquiry as to what was the matter, he replied, "You ought to have come to me sooner." She walked along with him fifty or sixty feet, asking him repeatedly what was the matter, but he did not answer, and seemed speechless. He stepped, however, to where a pile of onions were lying on the ground, and said, "Here are some onions I got for your dinner," and stooped down to pick them up. As he did so, the blood poured out of the cut in his side "like you had poured water out of a bucket." Witness asked him if Mr. Douglass had cut him, and he replied, "yes, that Douglass had cut him all to pieces, and here is the knife he did it with;" and he handed to witness a butcher-knife, which she identifies before the jury, and the blade of which was about six inches in length and one and a half in width. Deceased walked a step or two farther, sank down, and witness asked him if he could not walk to the house. Getting no answer, she knelt down by him and asked him if he could not speak to her once more. He moved his lips, but could not speak, and so died.

This witness stated that she noticed blood where the

onions were lying, and that the blood was there before the deceased stepped there to get them. His skull was broken in, and he was cut in the right side, and in the face, the back, and the hand. Early in the day the witness and her husband had both gone a few miles from home. She returned about eleven o'clock, and, though he was not at the house, she knew he had returned, as an axe was there for which he had gone, and his gun was gone which he had not taken with him when he went after the axe.

Herman Gantz, for the State, testified that he was ploughing at a distance of about four hundred yards from where the conflict occurred, when his attention was called in that direction by the report of a gun. He saw King Bryant, the deceased, with his gun elevated and smoke arising there. Witness ploughed about ten steps and heard Mrs. Douglass hallooing "Bryant," and saw her running towards the garden. Witness looked and saw Douglass with something in both hands, and striking some one on the ground. This was between the garden and Bryant's house. About the time Mrs. Douglass reached her husband, he got up, folded his arms, and went rapidly towards his house. The deceased then got up from the ground, and Mrs. Douglass picked something up from the ground and handed it to him, and then walked off towards her house. By this time Mrs. Bryant had reached the deceased, and they started towards their house, but got only a short distance until he sank down and got up no more. Defendant was bareheaded and in his shirt-sleeves when witness saw him during the conflict. After it was over he sent for witness, who found him lying on a pallet, wounded in the left arm by a shot. When witness went in, the defendant, laughing, said, "The cowardly bugger shot me; but I cut him up and broke the gun over his head, and I reckon that will do him for a while." At that time the defendant owned a shot-gun and a rifle, and they were both at his house when witness went there on this occasion.

Two other witnesses observed something of the conflict

from a distance, but their testimony was less specific than that of Gantz.

Durham, a witness for the State, testified that the defendant, the day before the homicide, told him that Bryant had been gone off about two weeks, and he did not like his way of farming, that Bryant would be back the next day, and he, the defendant, would have a reckoning with him.

J. S. Sterrett, for the State, testified that the butcher-knife identified by Mrs. Bryant was the same knife which the defendant had at witness's house, two or three weeks before Bryant was killed. Witness then pruned some trees with it. The garden or onion patch was about two hundred and fifty yards from the defendant's house, and could be seen from there.

Testimony was adduced by the State with reference to the tracks of the defendant and the deceased at and around the scene of the conflict. The deceased's tracks in the garden indicated that he had been pulling up onions, and onions were found scattered along from where he had pulled them to the immediate arena. A detail of this testimony would serve no purpose, as its cogency depended on a more exact knowledge than the record affords of the locality and the relative range of the tracks. It may be inferred, however, that the prosecution drew from it, in connection with other evidence, the conclusion that the defendant, seeing the deceased at the onion patch, sought him there, circled around between him and his house, and that there was a retreat and pursuit from where the deceased was pulling onions to the immediate arena, to be accounted for most reasonably on the theory that the deceased was the retreating and the defendant the pursuing party. It was in proof that the defendant was the larger man of the two, by from ten to twenty pounds.

The defence introduced William Starling, a step-son of the defendant. He heard the colloquy at the garden between the defendant and Mrs. Bryant, of which she tes-

tified. According to his version of it, the defendant's remarks to her were in less offensive language, but of the same general purport as those imputed by her to defendant. Witness recognized the butcher-knife in evidence as one. he had borrowed for the purpose of skinning sheep. It usually hung in the kitchen of the defendant, who, however, sometimes carried it, as he had no pocket-knife. A person at the onion patch could be seen from the defendant's house, but could not be seen from the place where the defendant was planting cotton the day of the homicide.

Mrs. Douglass, wife of the defendant, testified that the day Bryant was killed the defendant was ploughing in a part of the field from which the garden could not be seen. Witness was dropping cotton-seed. The defendant unhitched his team at the end of the row nearest the house, and went off. Witness did not notice where he went to, but she soon went to the house for more seed. Hearing the report of a gun while at the house, she looked down in the field and saw Bryant standing some forty or fifty yards beyond the garden with a gun in his hands, the muzzle elevated, and smoke arising above his head. She did not at that instant see her husband, but immediately observed Bryant raise his gun with both hands and run towards where she then saw her husband getting up from the ground, which was about forty cotton-rows, as she afterwards ascertained, from where she first saw Bryant with his gun, and about 300 yards from the house. Witness ran there as fast as she could, hallooing, "Bryant, don't kill Mr. Douglass." Just as Bryant reached Douglass, who was just straightening up, he struck him on the head with the gun, knocked him down, then struck him again, threw the gun down and jumped on him, and seemed to be striking him. When witness got to them, she asked Bryant what he was trying to kill Mr. Douglass for, and he replied, "Take him away." Douglass was wounded on the top and on the back of his head, and his arm was broken near the shoulder. Mrs.

Bryant came running from her house, hallooing "What is the matter?" and witness replied that Bryant had shot Mr. Douglass. There was no powder-burn on the defendant's flesh or clothes. Witness picked up from the ground the broken pieces of the gun, and gave them to Bryant. She did not see the defendant strike Bryant.

On her cross-examination by the State, this witness denied that in her testimony at the coroner's inquest, immediately after the homicide, she had stated that Bryant, when she first saw him, was advancing on the defendant, holding his gun by the muzzle, and in a striking position. The State introduced the record of the inquest, which, in this particular, had Mrs. Douglass's testimony in accordance with the version of it imputed to her by the State.

*Herring & Kelley*, for the appellant, filed an able brief and a forcible argument on the evidence.

*Thomas Ball*, Assistant Attorney-General, for the State.

CLARK, J. Conflicting theories, tending on the one hand to fix the guilt of the defendant at least to the extent found by the jury, and on the other hand to absolve him from punishment altogether, are legitimately deducible from the evidence laid before us; but every legitimate conclusion that was possible to be arrived at by the jury seems to have been anticipated by the learned judge below, and to have been presented to their consideration by a charge characterized by perfect completeness and accuracy.

At this day it certainly cannot constitute a subject for serious complaint, if, upon trial of a defendant for a capital felony, upon a state of facts which may justify a conclusion that the homicide was perpetrated with express malice, the court sees proper to instruct the jury that "former grudges, deliberate compassings, and concerted schemes to kill or do great bodily harm" are illustrative of the existence of that

species of malice attendant upon or promotive of the act; or that, when the facts show an antecedent malice, and a fresh provocation, the law, in its mercy, presumes in favor of the prisoner that the killing was upon the fresh provocation. Nor can complaint be heard, in a case involving the proper predicate of facts, if the jury are instructed " that if a person, with deliberate mind, forms a design to kill or do great bodily harm to another, and, with the design so formed, enters into a conflict to execute such purpose, and kills in pursuance of such design, the killing is with express malice." These propositions may be classed as truisms in the law, and abstractly correct beyond criticism.

It is urged, however, that these charges were calculated to mislead the jury, and cause them to take it for granted that malice on the part of defendant had been established, or at least that it was clear to the mind of the court that the homicide was committed through malice. If the criticism in this instance was just, it would be a difficult if not an impossible task to frame a series of instructions to a jury in most capital cases of homicide, and the legislative department ought to be invoked to furnish a speedy remedy for so serious a public grievance.

But the criticism is not just. The charge of the court is absolutely free from any intimation, positive or inferential, as to the weight of the testimony or any fact embraced therein, and the jury were properly left to determine for themselves the guilt or innocence of the defendant, as it appeared to them from the whole evidence, under the law as given them. Under a charge most favorable to the defendant, and presenting most accurately the law governing every issue in the case, they have reached a determination adverse to defendant's innocence; and in this state of the record, this court has invariably refused to disturb the verdict, if not against the evidence. *Bank* v. *The State*, 7 Texas Ct. App. 591, and authorities cited

Nor is any error perceived in that portion of the charge

which instructed the jury that where it is shown that a homicide was intentionally committed, and the facts show that it was done neither with express malice nor under circumstances excusing, justifying, or mitigating the act, that the law in that event implies malice, and the offence is murder in the second degree. This has been the established doctrine with us from the formation of our first court. *Harris* v. *The State, ante,* p. 90.

Defects in the minutes of the court as to the formal presentment of the indictment cannot be taken advantage of after verdict. *Johnson* v. *The State,* 7 Texas Ct. App. 210; *Jinks* v. *The State,* 5 Texas Ct. App. 68; *Houillion* v. *The State,* 3 Texas Ct. App. 538.

It would be a profitless task to enter into a minute discussion of the evidence, in answer to appellant's ingenious argument as to its insufficiency. The fact of killing is conceded, and it is only insisted that the evidence shows that the homicide is justifiable. Viewed from one stand-point, this may be so, and the jury might have found in the evidence a sufficient basis for such a finding. But from the entire evidence in the case, a conclusion that appellant is guilty of the offence found, if not of a higher offence, is equally legitimate. Under our practice, it was for the jury to say, amid conflicting theories, which was the correct one; and their verdict is amply supported by the testimony.

The judgment is affirmed.

*Affirmed.*